IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| PRIVATE CAPITAL GROUP, INC.,<br><br>Plaintiff,<br><br>v.<br><br>MARCELL SHINTUN DAREUS, ELI J. TENENBAUM, S.M.E. CAPITAL LLC, a Delaware limited liability company, ROBIN HENDERSON, GRANT CARTER, COBALT SPORTS CAPITAL LLC, a Colorado limited liability company, LOST STREAM SOLUTIONS, LLC, a Colorado limited liability company, AND CAPSTAR BANK INC, a federally chartered bank,<br><br>Defendants. | MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS<br><br><br>Case No. 2:13-CV-18 TS<br><br>District Judge Ted Stewart |

This matter is before the Court on Motions to Dismiss for Lack of Personal Jurisdiction filed by Defendants Capstar Bank Inc. ("Capstar"), Grant Carter ("Carter"), and Lost Stream Solutions, LLC ("Lost Stream").[1] For the reasons discussed below, the Court will grant Defendants' Motions.

## I. BACKGROUND

The following facts are relevant to Defendants' Motions to Dismiss. Unless otherwise noted, they are taken from Plaintiff's Amended Complaint and memoranda in opposition,[2] and are viewed in the light most favorable to Plaintiff as the nonmoving party.

---

[1] Docket Nos. 60, 62.

[2] Docket Nos. 34, 63, 64

Plaintiff Private Capital Group, Inc. ("PCG") is a Utah corporation organized and existing under the laws of the State of Utah.[3] Capstar is a federally chartered bank with all branches located in the state of Tennessee. Capstar maintained an independent contact and business relationship with the primary defendant Marcell Shintun Dareus ("Dareus").[4]

Lost Stream is a limited liability company organized and existing in the State of Colorado.[5] Carter is a private individual and a resident of the State of Colorado[6] and is also the President and sole member of Lost Stream.

On July 27, 2012, Solaris Capital, LLC, Andrew McClellen, TDC Lending, LLC (collectively the "Lenders"), and Eli J Tenenbaum ("Tenenbaum")—who claimed to be representing Dareus—entered into a Secured Promissory Note, Loan Agreement, and All-Assets Security Agreement (collectively, the "Loan Documents") wherein Dareus borrowed $1,267,436.00 (the "Loan"). PCG acts as servicer of the loan for and in behalf of all of the lenders.[7]

Prior to entering this agreement, PCG contacted Capstar.[8] Using a social security number provided by Tenenbaum, PCG had run a credit check on Dareus, which revealed that Dareus had an account with Capstar.[9] On July 24, 2012, a Capstar employee was involved in a conference call with PCG employees and their counsel during which the structure of the loan was discussed.

---

[3] Docket No. 14, at 5.

[4] Docket No. 34, at 6.

[5] *Id.* at 8.

[6] *Id.* at 7.

[7] *Id.* at 5.

[8] *Id.* at 4.

[9] *Id.*

The Capstar employee represented to PCG and all other parties that he had met Dareus and that Dareus had thanked him for his work as his banker.[10]  In addition, Capstar's employee provided PCG a letter stating that Capstar had seen a letter from the Buffalo Bills stating that Dareus would be receiving a bonus check in the amount of $2,900,000.00 on or before September 15, 2012.[11]  In reliance on the information provided, PCG entered into the loan agreement whereby $244,096.00 was wired to an account at Capstar that allegedly belonged to Dareus.[12]  Plaintiff contends that Dareus did not bank with Capstar and that Capstar made false representations to PCG.

In addition to its discussions with Capstar, PCG made contact with Defendant Carter. Carter represented that he had discussions with Dareus and that in these discussions, "they discussed the techniques of defensive lineman at a level of sophistication that convinced Carter that he was actually speaking to a professional football player."[13]  Ultimately, PCG dispursed $815,556.00 to the account of Lost Stream, a company which "owns certain rights and obligations pursuant to an agreement with Cobalt Sports Capital."[14]  Plaintiff alleges that this disbursement was intended to repay a loan given by Carter to Dareus.[15]  Lost Stream represented to PCG that Dareus had an outstanding debt with Cobalt, which Plaintiff contends Dareus did not.[16]

---

[10] *Id.*

[11] Docket No. 63, at 3.

[12] *Id.* at 16.

[13] Docket No. 34, at 5–6.

[14] Docket 64, at 4.

[15] *Id.* at 7.

[16] *Id.* at 17–18.

Plaintiff filed suit against Defendant Dareus in the Third Judicial District Court, State of Utah, alleging breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment. Defendant removed the case to this Court. An Amended Complaint was filed on October 10, 2013, naming the Defendants at issue here. Against the moving Defendants, Plaintiff asserts claims for conversion, fraudulent misrepresentation, and negligent misrepresentation. Against Defendants Lost Stream and Carter, Plaintiff asserts a claim for unjust enrichment. Against Defendant Carter, Plaintiff asserts a claim for civil conspiracy. Defendants now seek dismissal, arguing that the Court lacks personal jurisdiction.

## II. PERSONAL JURISDICTION STANDARD

"The plaintiff bears the burden of establishing personal jurisdiction, but where, as here, the issue is raised early on in litigation, based on pleadings . . . and affidavits, that burden can be met by a prima facie showing."[17] "The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits. If the parties present conflicting affidavits, all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient."[18]

"In order to defeat a plaintiff's prima facie showing of jurisdiction, a defendant must present a compelling case demonstrating 'that the presence of some other considerations would render jurisdiction unreasonable.'"[19] "[I]n the absence of a full evidentiary hearing, a district

---

[17] *Shrader v. Biddinger*, 633 F.3d 1235, 1239 (10th Cir. 2011) (quoting *Dudnikov v. Chalk & Vermillion Fine Arts, Inc.*, 514 F.3d 1063, 1069–70 (10th Cir. 2008)).

[18] *Kennedy v. Freeman*, 919 F.2d 126, 128 (10th Cir. 1990) (quoting *Behagen v. Amateur Basketball Ass'n of the U.S.*, 744 F.2d 731, 733 (10th Cir. 1984)).

[19] *OMI Holdings, Inc. v. Royal Ins. Co. of Can.*, 149 F.3d 1086, 1091 (10th Cir. 1998) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)).

court relying on documentary evidence in its consideration of a motion to dismiss may not weigh the factual evidence."[20]

"To obtain personal jurisdiction over a nonresident defendant in a diversity action, a plaintiff must show that jurisdiction is legitimate under the laws of the forum state and that the exercise of jurisdiction does not offend the due process clause of the Fourteenth Amendment."[21] "It is frequently helpful to undertake the due process analysis first, because any set of circumstances that satisfies due process will also satisfy the long-arm statute."[22]

## III. DISCUSSION

A due-process analysis of personal jurisdiction is a two-step inquiry. First, this Court must consider whether the defendant has sufficient "minimum contacts" with the forum state "that he should reasonably anticipate being haled into court there."[23] Second, "if the defendant's actions create sufficient minimum contacts, the court must then consider whether the exercise of personal jurisdiction over the defendant offends traditional notions of fair play and substantial justice."[24]

The minimum-contacts standard can be established through a finding of either general jurisdiction or specific jurisdiction.

---

[20] *Ten Mile Indus. Park v. W. Plains Serv. Corp.*, 810 F.2d 1518, 1524 (10th Cir. 1987).

[21] *Soma Med. Int'l v. Standard Chartered Bank*, 196 F.3d 1292, 1295 (10th Cir. 1999).

[22] *Sys. Designs, Inc. v. New Customware Co.*, 248 F. Supp. 2d 1093, 1097 (D. Utah 2003).

[23] *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

[24] *OMI Holdings, Inc.*, 149 F.3d at 1091 (citation and internal quotation marks omitted).

A.    GENERAL JURISDICTION

For general jurisdiction to exist, "'the defendant must be conducting substantial and continuous local activity in the forum state.'"[25]  These activities must be continuous and systematic to justify a finding of general jurisdiction.[26]

Defendants correctly argue contacts with Utah are insufficient to allow a finding of general jurisdiction.  Plaintiff attempts to argue that the Court may exercise general jurisdiction over Capstar because Capstar offers banking services around the country and allegedly has customers in the State of Utah.

Taken as true, these facts fail to support a finding of general jurisdiction.  "As [the Supreme Court has] . . . explained, '[a] court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the state are so continuous and systematic as to render them essentially at home in the forum State.'"[27]  Because Plaintiff's alleged facts, taken as true do not establish that Capstar's contacts are "so 'continuous and systematic' as to render them essentially at home"[28] in Utah, Plaintiff has failed to meet its burden to plead facts demonstrating general jurisdiction.

---

[25] *Soma*, 196 F.3d at 1295 (quoting *Arguello v. Indus. Woodworking Mach. Co.*, 838 P.2d 1120, 1122 (Utah 1992)).

[26] *Helicopteros Nacionales de Colombia S.A. v. Hall*, 466 U.S. 408, 416 (1984).

[27] *Daimler AG v. Bauman*, 134 S. Ct. 746, 754 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011)).

[28] *Id.*

B.     SPECIFIC JURISDICTION

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons."[29]  This is because the extent of a federal district court's jurisdiction is linked to service of process on defendants "subject to the general jurisdiction in the state where the district court is located."[30]  For this reason, the Court must look to the restrictions of general jurisdiction created by the Utah long arm statute, as well as the constitutional requirements of due process. The Tenth Circuit has identified a three-part inquiry in such an analysis.  "(1) the defendant's acts or contacts must implicate Utah under the Utah long-arm statute; (2) a 'nexus' must exist between the plaintiff's claims and the defendant's acts or contacts; and (3) application of the Utah long-arm statute must satisfy the requirements of federal due process."[31]

The Utah Legislature has determined the Utah long-arm statute "should be applied so as to assert jurisdiction over nonresident defendants to the fullest extent permitted by the due process clause of the Fourteenth Amendment to the United States Constitution."[32]  The Utah Supreme Court "frequently make[s] a due process analysis first because any set of circumstances that satisfies due process will also satisfy the long-arm statute."[33]  Thus, "in order to determine whether the Federal District Court in this case . . . [is] authorized to exercise jurisdiction over . . .

---

[29] *Id.* at 753.

[30] Fed. R. Civ. P. 4(k)(1)(A).

[31] *Soma*, 196 F.3d at 1297 (quoting *Nat'l Petroleum Mktg., Inc. v. Phoenix Fuel Co.*, 902 F. Supp. 1459, 1465 (D. Utah 1995)).

[32] Utah Code Ann. § 78B-3-201(3) (2008).

[33] *Soma*, 196 F.3d at 1298 (quoting *SII MegaDiamond, Inc. v. Am. Superabrasives Corp.*, 969 P.2d 430, 433 (Utah 1998)); *see also Farr W. Capital, Inc. v. Towne*, 46 F.3d 1071, 1075 (10th Cir. 1995).

[Defendants], we ask whether the exercise of jurisdiction 'comports with the limits imposed by federal due process on the state of [Utah].'"[34]

"The inquiry whether a forum state may exercise jurisdiction over a nonresident defendant 'focuses on the relationship among the defendant, the forum, and the litigation.' For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State."[35] The Supreme Court in *Walden v. Fiore* specifically addressed two elements of a defendant's relationship with a forum state that are necessary for the exercise of specific jurisdiction, neither of which are present with regards to the moving Defendants.

"First, the relationship must arise out of contacts that the 'defendant *himself*' creates with the forum State."[36] "Due Process limits . . . principally protect the liberty of the nonresident defendant—not the convenience of plaintiffs or third parties."[37] Plaintiff argues that it is necessary for all parties to be joined in a single litigation in Utah in order to solicit testimony from all parties, but the convenience of Plaintiff carries no weight in an analysis of personal jurisdiction.[38] "Put simply, however significant the plaintiff's contacts with the forum may be, those contacts cannot be 'decisive in determining whether the defendant's due process rights are violated.'"[39]

---

[34] *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014).

[35] *Id.* at 1121–22 (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984)).

[36] *Id.* at 1122 (quoting *Burger King Corp.*, 471 U.S. at 475).

[37] *Id.*

[38] *Id.*

[39] *Id.* (quoting *Rush v. Savchuk*, 444 U.S. 320, 332 (1980)).

Second, minimum-contacts analysis looks to the defendant's contacts with the forum state itself, not defendant's contacts with residents of that state.[40]  Accordingly, the Supreme Court has found jurisdiction appropriate over defendants who have reached into the forum state for "envisioned continuing and wide-reaching contacts"[41] or to "deliberately exploit[]" a market in the forum state.[42]  "But the plaintiff cannot be the only link between the defendant and the forum.  Rather, it is the defendant's conduct that must form the necessary connection with the forum state that is the basis for its jurisdiction over him."[43]  "To be sure, a defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff . . . [b]ut a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction."[44]

Under *Walden*, this Court cannot exercise personal jurisdiction over Capstar, Carter, or Lost Stream.  Plaintiff has pleaded no facts to indicate that either Capstar, Carter, or Lost Stream "envisioned continued or wide-reaching contacts"[45] with the State of Utah, or that Capstar, Carter, or Lost Stream reached out intending to "deliberately exploit[]"[46] markets within Utah. Despite a significant showing of Plaintiff's contacts with the forum state, Plaintiff has failed to show any contacts between any of the Defendants at issue and the forum state.  All contacts, connections, and communications happened at the instigation of PCG and there is nothing to

---

[40] *Id.*

[41] *Burger King Corp.*, 471 U.S. at 479–80.

[42] *Keeton*, 465 U.S. at 781.

[43] *Walden*, 134 S. Ct. at 1122.

[44] *Id.* at 1123.

[45] *Burger King Corp.*, 471 U.S. at 479–80.

[46] *Keeton*, 465 U.S. at 781.

indicate that the moving Defendants intended to expand their business into the forum State, or that they solicited such contacts as those made by PCG. Further, contacts made between PCG and Capstar, Carter, and Lost Stream that originated from PCG are "precisely the sort of 'unilateral activity' of a [plaintiff] that 'cannot satisfy the requirement of contact with the forum state.'"[47]

Plaintiff argues that under *Calder v. Jones*,[48] the exercise of jurisdiction is reasonable in light of the fact that the totality of the suffered harms occurred in Utah.[49] Because the tortious harms were centralized in the forum state, and intentionally directed at a resident of that state, PCG argues that the minimum-contacts test is satisfied and an exercise of personal jurisdiction is appropriate.

*Calder* requires

the presence of (a) an intentional action (writing, editing, and publishing the article), that was (b) expressly aimed at the forum state (the article was about a California resident and her activities in California; likewise it was drawn from California sources and widely distributed in that state), with (c) knowledge that the brunt of the injury would be felt in the forum state (defendants knew Ms. Jones was in California and her career revolved around the entertainment industry there).[50]

In clarifying the applicability of the *Calder* test, the Supreme Court recently explained,

The [Calder] defendants relied on phone calls to 'California sources' for the information in their article; they wrote the story about the plaintiffs activities in California; they caused reputational injury in California by writing an allegedly libelous article that was widely circulated in the State; and the 'brunt' of that injury was suffered by the plaintiff in that state.[51]

---

[47] *Walden*, 134 S. Ct. at 1125 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).

[48] 465 U.S. 783 (1984).

[49] Docket No. 64, at 12.

[50] *Dudnikov*, 514 F.3d at 1072.

[51] *Walden*, 134 S. Ct. at 1123.

The crux of *Calder* was that the reputation-based "effects" of the alleged libel connected the defendant to California, not just to the plaintiff. The strength of that connection was largely a function of the nature of the libel tort. However scandalous a newspaper article might be, it can lead to a loss of reputation only if communicated to . . . third persons. Accordingly, the reputational injury caused by the defendants' story would not have occurred but for the fact that the defendants wrote an article for publication in California that was read by a large number of California citizens. Indeed, because publication to third persons is a necessary element of libel, the defendants' intentional tort actually occurred in California. In this way, the "effects" caused by the defendants' article— *i.e.*, the injury to the plaintiff's reputation in the estimation of the California public— connected the defendants' conduct to California, not just to a plaintiff who lived there.[52]

PCG is not claiming a libel tort, nor any tort that requires the publication, or delivery, of material to third parties in the forum State. Therefore, the type of facts justifying jurisdiction in *Calder* are not found here. The only connection to Utah is the fact that Plaintiff is a Utah corporation and the alleged injury is felt in this state. However, as stated, Plaintiff's connections to Utah are insufficient to establish the minimum contacts necessary for the exercise of personal jurisdiction. "*Calder* made clear that mere injury to a forum resident is not a sufficient connection to the forum."[53] Further, the complaint does not allege sufficient information to show that the defendants' allegedly tortious conduct was "expressly aimed at the forum state," not Plaintiff.[54]

Plaintiff further argues that Cobalt Sports Capital's admitted minimum contacts should be imputed to Lost Stream. However, "[m]inimum contacts must be found as to each defendant

---

[52] *Id.* at 1123–24 (citations omitted).

[53] *Id.* at 1125.

[54] *Dudnikov*, 514 F.3d at 1072.

over whom the court exercises jurisdiction."[55]  As set forth above, Plaintiff has failed to show minimum contacts as to Lost Stream.  Therefore, this argument fails.

Based on the forgoing, this Court finds that neither Capstar, Carter, nor Lost Stream have sufficient minimum contacts to allow this Court to exercise personal jurisdiction over them. Because it finds that defendants lack sufficient minimum contacts so as to render an exercise of jurisdiction inappropriate, the Court will not address the traditional notions of fair play and substantial justice element of the personal jurisdiction analysis.

## IV.  CONCLUSION

It is therefore

ORDERED that Defendants' Motions to Dismiss for Lack of Personal Jurisdiction (Docket Nos. 60 and 62) are GRANTED.

DATED this 10th day of July, 2014.

BY THE COURT:

Ted Stewart
United States District Judge

---

[55] *Home-Stake Prod. Co. v. Talon Petroleum, C.A.*, 970 F.2d 1012, 1020 (10th Cir. 1990).